## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION<br>125 Broad Street<br>New York, NY 10004,<br><br>AMERICAN CIVIL LIBERTIES UNION<br>FOUNDATION<br>125 Broad Street<br>New York, NY 10004,<br><br>              Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF HOMELAND<br>SECURITY<br>3801 Nebraska Avenue NW<br>Washington, DC 20016,<br><br>DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530,<br><br>FEDERAL BUREAU OF INVESTIGATION<br>935 Pennsylvania Avenue NW<br>Washington, DC 20535,<br><br>OFFICE OF THE DIRECTOR<br>OF NATIONAL INTELLIGENCE<br>1500 Tysons McLean Drive<br>McLean, VA 22102,<br><br>DEPARTMENT OF STATE<br>2201 C Street NW<br>Washington, DC 20520,<br><br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES<br>200 Independence Avenue SW<br>Washington, DC 20201,<br><br>DEPARTMENT OF EDUCATION<br>400 Maryland Avenue SW<br>Washington, DC 20202,<br><br>              Defendants. | No. _____ |

## COMPLAINT FOR INJUNCTIVE RELIEF

1.      This lawsuit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552,

seeks the release of records related to the federal government's "Countering Violent Extremism"

("CVE") programs—a sweeping set of measures identified as a top national security priority.

These programs are expanding rapidly within the Defendant agencies, and likely have a

significant impact on Americans' civil liberties and privacy rights. However, Defendants have

released only the broadest outlines of CVE programs, leaving the public ill-equipped to assess

whether the programs have an evidentiary basis and are subject to adequate privacy and civil

rights safeguards.

2.      In 2011, the White House released its "Strategic Implementation Plan," which

tasked government agencies, prime among them Defendants Department of Homeland Security

("DHS"), Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Office of the

Director of National Intelligence ("ODNI") and Department of State ("DOS"), with executing

CVE programs. Since then, the government, led by or with the participation of officials from

Defendants DHS, DOJ, and DOS, has convened national and international CVE summits, sought

and awarded funding for CVE initiatives, instituted a CVE pilot program in three U.S. cities, and

launched an international network of city governments designed to share best CVE practices.

These efforts are intensifying rapidly. On January 8, 2016, Defendants DHS and DOS announced

more new CVE initiatives.

3.      Based on the scant information that has been made public, the premise of federal

CVE programs is that the adoption of extreme or "radical" ideas places individuals on a path

toward violence, and that there are observable "indicators" to identify those who are

"vulnerable" to "radicalization" or "at risk" of being recruited by terrorist groups. Defendants

2

have not publicly disclosed any scientific or other evidentiary support for this premise. Decades of research and experience in the United States and elsewhere make clear that researchers have not developed reliable criteria to predict who will commit an act of violent extremism.

4.      Also based on publicly available information, the CVE initiatives that have been implemented in the United States pose serious risks to the right to equal protection and the freedoms of speech, religion, and association. The initiatives implemented by Defendant DOJ in three pilot U.S. cities—Boston, Los Angeles, and Minneapolis—are aimed almost exclusively at American Muslim communities, stigmatizing them as inherently suspect and raising the prospect that the government is targeting them based on First Amendment-protected religious worship, association, or expression.

5.      On May 13, 2015, Plaintiffs American Civil Liberties Union and American Civil Liberties Union Foundation (together, "ACLU") submitted a FOIA request ("Request") to Defendants seeking the release of records concerning Defendants' CVE programs. Plaintiffs sought expedited processing and a waiver of fees. Five of the seven Defendants either failed to respond to the Request or released no records in response to the Request. Two Defendants produced a small number of documents after insufficient searches, and improperly withheld other records.

6.      The public interest in the release of these documents is manifest. Members of communities affected directly by CVE programs, and Americans of all backgrounds, have an urgent need to understand how CVE plans and policies are being implemented, who and what beliefs and conduct the programs target, and what consequences the programs have for Americans' privacy and civil rights. Plaintiffs are entitled to immediate processing of the Request and timely release of the records.

**Jurisdiction and Venue**

7.      This Court has subject matter and personal jurisdiction over this action pursuant

to 28 U.S.C. § 1331; 5 U.S.C. §§ 552(a)(4)(A)(vii), (4)(B), and (6)(E)(iii); and 5 U.S.C. §§ 701-

06. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

**Parties**

8.      Plaintiff American Civil Liberties Union is a nationwide, non-profit, non-partisan

organization with over 500,000 members dedicated to the constitutional principles of liberty and

equality. The ACLU is committed to ensuring that the U.S. government acts in compliance with

the Constitution and laws, including international legal obligations. The ACLU is also committed

to principles of transparency and accountability in government, and seeks to ensure that the

American public is informed about the conduct of its government in matters that affect civil

liberties and human rights. Obtaining information about government activity, analyzing that

information, and widely publishing and disseminating it to the press and the public (in both its

raw and analyzed form) is a critical and substantial component of the ACLU's work and one of

its primary activities.

9.      Plaintiff American Civil Liberties Union Foundation is a separate § 501(c)(3)

organization that educates the public about civil liberties and employs lawyers who provide legal

representation free of charge in cases involving civil liberties.

10.     Defendant DHS is a department of the Executive Branch of the United States

government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

11.     Defendant DOJ is a department of the Executive Branch of the United States

government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

12.     Defendant FBI is a component of DOJ and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

13.     Defendant ODNI is a department of the Executive Branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

14.     Defendant DOS is a department of the Executive Branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

15.     Defendant Department of Health and Human Services ("HHS") is a department of the Executive Branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

16.     Defendant Department of Education ("DOE") is a department of the executive branch of the U.S. government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

### Factual Background

17.     In 2011, the White House released its "Strategic Implementation Plan for Empowering Local Partners to Prevent Violent Extremism in the United States." The Plan's "overarching goal" is to "prevent[] violent extremists and their supporters from inspiring, radicalizing, financing, or recruiting individuals or groups in the United States to commit acts of violence." The Plan describes Defendants' support for "community-led efforts to build resilience to violent extremism" and "preventative programming," and it identifies three "areas of priority action":

> (1) enhancing Federal engagement with and support to local communities that may be targeted by violent extremists; (2) building government and law enforcement expertise for preventing violent extremism; and (3) countering violent extremism propaganda while promoting our ideals.

The Strategic Implementation Plan tasks Defendants, among others, with executing CVE programs. *See* Office of the President, *Strategic Implementation Plan for Empowering Local Partners to Prevent Violent Extremism in the United States*, The White House (Dec. 2011), at 1-2, 7, 10, 12, 18.

18.     In September 2014, Attorney General Eric Holder announced a CVE pilot program, the stated intent of which was to "bring together community representatives, public safety officials, religious leaders, and United States Attorneys to improve local engagement; to counter violent extremism; and—ultimately—to build a broad network of community partnerships to keep our nation safe." The pilot program was implemented initially in Boston, Los Angeles, and Minneapolis. Press Release, *Attorney General Holder Announces Pilot Program to Counter Violent Extremists* (Sept. 15, 2014).

19.     In February 2015, Defendants DHS and DOJ participated in a CVE summit. The summit focused on "the drivers and indicators of radicalization and recruitment to violence"; methods of "directly addressing and countering violent extremist recruitment narratives"; and "empowering community efforts to disrupt the radicalization process." It was announced at the summit that Defendant DOJ had already awarded nearly $3.5 million in grants "to address domestic radicalization to violent extremism" and would seek an additional $15 million in appropriated funding. Office of the Press Secretary, *Fact Sheet: The White House Summit on Countering Violent Extremism*, The White House (Feb. 18, 2015).

20.     In July 2015, the House Homeland Security Committee considered and recommended for passage H.R. 2899, the Countering Violent Extremism Act of 2015, which would allocate $10 million for the creation of a Countering Violent Extremism Office within Defendant DHS. In considering H.R. 2899, the Committee rejected an amendment that would

have enabled federal government agencies to evaluate and assemble empirical data regarding the prevalence and sources of extremist violence before directing federal agencies to implement programs targeted at particular American communities.

21.     In September 2015, officials from Defendant agencies participated in a Leaders' Summit on Countering ISIL and Violent Extremism, in coordination with the United Nations, at which participants proceeded with developing and implementing CVE programs. Press Release, The White House, *Leaders' Summit on Countering ISIL and Violent Extremism* (Sept. 29, 2015).

22.     Defendant DOJ has promoted the launch of the Strong Cities Network, an international information-sharing network of city governments, which DOJ describes as a platform to "strengthen community resilience against violent extremism." Press Release, Dep't of Justice, *Launch of Strong Cities Network to Strengthen Community Resilience Against Violent Extremism* (Sept. 28, 2015). To date, New York City, Atlanta, Denver, and Minneapolis have joined the Strong Cities Network.

23.     Despite all these efforts, Defendants have not released even basic information on CVE programs, including the policies that govern them; any training for officials tasked with carrying out CVE programs; safeguards to protect Americans' privacy and civil rights; the criteria for receiving and awarding CVE-related funding (including the nearly $3.5 million in grants already issued by Defendant DOJ through the National Institute of Justice); the specific methods Defendants use in implementing the programs;  or research or assessments Defendants are using to justify the need for and implementation of the programs. The public, therefore, remains uninformed about all but the broadest outlines of these programs.

24.     What little has been revealed about CVE programs raises serious questions about religious and racial profiling of American Muslim communities. Officials at Defendant agencies

have asserted that CVE is aimed at all forms of violent extremism, without regard to particular belief systems. However, news accounts and reports from American Muslim community leaders about the CVE pilot initiatives in Boston, Los Angeles, and Minneapolis make clear these initiatives are targeted at American Muslim communities. This focus on American Muslims aggravates existing societal prejudice and reinforces the corrosive and misleading notion that these communities are more prone to violence.

25.     CVE programs planned or implemented by Defendants appear to task Americans with monitoring and reporting on each other's beliefs, associations, and expressive activities. For example, a CVE program in Minneapolis asks teachers and other school staff to monitor and identify students who they believe are at risk of "radicalization" or engaging in "violent extremism." Defendants have not made public the criteria by which school officials are to make such judgments, where and by whom a school official's "report" would be stored, and the consequences for students' privacy and civil rights if such a report is made. The National Counterterrorism Center, a component of Defendant ODNI, developed a rating scale for teachers and social workers to evaluate students' susceptibility to engage in violence, which included categories such as "Connection to Group Identity (Race, Nationality, Religion, Ethnicity)," and "Expressions of Hopelessness, Futility." By framing First Amendment-protected activities as potential indicators or predictors of violence, Defendants' CVE initiatives encourage law enforcement and other government agencies to target individuals based on such activities or use them as a basis for other action.

26.     Empirical studies show that religious observance or adherence to "radical" ideas does not predict one's propensity toward violence. While some of Defendants' few publicly-available CVE-related materials acknowledge the complex and variegated forces that give rise to

violence, other materials appear to embrace the notion that "radicalization" occurs along a fixed

trajectory with specific, identifiable markers—a notion that has been thoroughly discredited.

Studies show that no single, identifiable pathway to terrorism or violence exists.

27.     Based on publicly available information, the United States is urging foreign

governments to implement similar programs under the guise of CVE and is funding those

programs overseas.

28.     What little has been revealed publicly about Defendants' CVE programs has

generated widespread and sustained media interest.

29.     Given the paucity of information on Defendants' CVE programs, and given the

potential impacts of the programs on targeted communities—particularly American Muslim

communities—it is imperative that the public gain a greater understanding of the policies,

practices, methods, and outcomes associated with such programs.

### The ACLU's FOIA Request

30.     On May 13, 2015, the ACLU submitted its FOIA Request to Defendants seeking

the release of CVE-related policies or guidance; records that serve as the basis for CVE

programs; communications with state, local, tribal, or other federal agencies, and foreign

governments, regarding CVE programs; CVE-related training materials; criteria used to

determine which agencies are eligible to receive CVE-related funding; and records regarding the

recipients of any CVE-related funding.

31.     The ACLU sought expedited processing of the Request on the basis that the

ACLU is primarily engaged in disseminating information, and the records are urgently needed to

inform the public about actual or alleged federal government activity. *See* 5 U.S.C.

§ 552(a)(6)(E)(v); 6 C.F.R. § 5.5(d)(1)(ii); 28 C.F.R. § 16.5(e)(1)(ii); 32 C.F.R. § 1700.12(c)(2); 22 C.F.R. § 171.12(b)(2)(ii); 34 C.F.R. § 5.21(i)(2)(i)(B).

32.     The ACLU sought a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest because it is "likely to contribute significantly to public understanding of the operations or activities of the government" and is not in the ACLU's commercial interest. *See* 5 U.S.C. § 552(a)(4)(A)(iii); 32 C.F.R. § 1700.6(b)(2); 22 C.F.R. § 171.17(a); 45 C.F.R. § 5.45(a); 34 C.F.R. § 5.33(a). The ACLU also sought a fee waiver because it qualifies as a "representative of the news media" and the records are not for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II); 6 C.F.R. §5.11(d)(1); 28 C.F.R. § 16.10(d)(1).

### Agency Responses and ACLU Appeals

*Department of Homeland Security*

33.     Three DHS offices responded to the ACLU's Request:

a.      By letter dated May 26, 2015, the DHS Office of Intelligence and Analysis denied the ACLU's expedited processing and fee waiver requests, stating, "DHS will invoke a 10-day extension for your request," and "[w]e shall charge you for records in accordance with the DHS Interim FOIA regulations as they apply to non-commercial requestors."

b.      The ACLU has received no further response or correspondence from the Office of Intelligence and Analysis, including whether the office has identified and/or intends to disclose any record.

c.      By letter dated May 28, 2015, the DHS Privacy Office denied the ACLU's

request for expedited processing. By the same letter, the Privacy Office

conditionally granted the ACLU's fee waiver request.

d.      By letter dated July 24, 2015, the ACLU administratively appealed the

Privacy Office's denial of its request for expedited processing.

e.      On August 21, 2015, the Privacy Office upheld its denial of the request for

expedited processing.

f.      The ACLU has received no further response or correspondence from the

Privacy Office, including whether it has identified and/or intends to

disclose any record.

g.      By letter dated July 22, 2015, the DHS Science and Technology office

("S&T") denied the ACLU's request for expedited processing and

conditionally granted the fee waiver request, relying on the DHS Privacy

Office's May 28, 2015, decision.

h.      By letter dated August 20, 2015, S&T informed the ACLU that it had

conducted a search for the key terms "CVE," "radicalization," "pilot

program," "research projects," "Boston," "Los Angeles," "Minneapolis,"

"community awareness," and "community resilience exercise." According

to S&T, the search produced 221 pages of responsive documents, 80 of

which are located online. Of the non-publicly available records, S&T

released 16 pages in their entirety and 10 partially redacted pages, and

withheld 115 pages in their entirety pursuant to 5 U.S.C. §§ 552(b)(5) and

(b)(6).

      i.      By letter dated October 15, 2015, the ACLU administratively appealed S&T's denial of the request for expedited processing, the sufficiency of S&T's search, and the scope of the production.

      j.      By letter dated January 11, 2016, the denial of the ACLU's request for expedited processing was upheld.

      k.      The ACLU has received no further response or correspondence from S&T, including a determination on the ACLU's administrative appeal of the sufficiency of its search and scope of production.

*Department of Justice*

34.      The ACLU has received no response from DOJ to its Request.

*Federal Bureau of Investigation*

35.      By letter dated June 17, 2015, the FBI granted the ACLU's expedited processing request and stated that the "request for a fee waiver is being considered and you will be advised of the decision at a later date." The letter also stated that the FBI is "searching the indices" for responsive documents and "will inform [the ACLU] of the results in future correspondence."

36.      The ACLU has received no further response or correspondence from the FBI, including whether it has identified and/or intends to disclose any record.

*Office of the Director of National Intelligence*

37.      By letter dated June 5, 2015, the ODNI denied the ACLU's request for expedited processing. The letter did not address the ACLU's fee waiver request.

38.      By letter dated July 8, 2015, the ODNI denied the ACLU's Request for records, asserting that "it is overly burdensome and does not reasonably describe the records sought."

39.     By letter dated August 21, 2015, the ACLU administratively appealed the ODNI's denial of its Request.

40.     The ACLU has received no further response or correspondence from the ODNI, including whether it has identified and/or intends to disclose any record.

*State Department*

41.     By letter dated May 21, 2015, DOS denied the ACLU's request for expedited processing.

42.     By letter dated June 19, 2015, the ACLU administratively appealed the denial of its request for expedited processing.

43.     The ACLU has received no further response or correspondence from DOS, including whether it has identified and/or intends to disclose any record.

*Department of Health and Human Services*

44.     By letter dated May 18, 2015, the HHS Immediate Office of the Secretary ("IOS") acknowledged receipt of the ACLU's Request but did not respond to the ACLU's expedited processing and fee waiver requests.

45.     By letter dated July 20, 2015, IOS issued its "final response" to the ACLU's Request, stating that it had "conducted a search for responsive records and located (9) nine pages," which it released in their entirety. The letter also stated IOS had referred the ACLU's Request to the HHS Administration for Children and Families for direct response.

46.     By letter dated August 18, 2015, the ACLU administratively appealed the sufficiency of HHS's search for records responsive to the Request.

47.     IOS informed the ACLU by letter it anticipated completion of the administrative appeal by September 17, 2015.

48.     The ACLU has received no further response or correspondence from HHS, including whether it has identified and/or intends to disclose any record.

*Department of Education*

49.     By letter dated June 16, 2015, the DOE denied the ACLU's request for expedited processing. The DOE granted the ACLU's fee waiver request.

50.     By letter dated July 20, 2015, the ACLU administratively appealed the DOE's denial of its request for expedited processing.

51.     By letter dated July 24, 2015, the DOE informed the ACLU that "after a search based on the information you provided in your request, there are no documents responsive to your request."

52.     By letter dated October 15, 2015, the ACLU submitted a renewed, modified Request to the DOE, requesting the same records as the original Request but specifying that the Request may also include records pertaining to efforts to monitor students' activity, both online and offline, in schools; programs for identifying students who appear "disconnected"; and how and when to refer a student to law enforcement, mental health, or other specialized service providers before the student "mobilizes" to violent extremism.

53.     By letter dated November 2, 2015, the DOE acknowledged receipt of the ACLU's request. By letter dated December 1, 2015, the DOE denied the ACLU's request for expedited processing, stating the ACLU has "not demonstrated a compelling need for the information," nor "substantiated that there is an urgency to inform the public concerning any actual or alleged Federal Government activity." The DOE granted the ACLU's fee waiver request.

54.     By letter dated December 18, 2015, the ACLU administratively appealed the denial of its expedited processing request.

55.     By letter dated December 18, 2015, the DOE acknowledged receipt of the ACLU's administrative appeal.

56.     The ACLU has received no further response or correspondence from the DOE including whether it has identified and/or intends to disclose any record.

**Plaintiffs' Entitlement to Expedited Processing**

57.     Plaintiffs are entitled to expedited processing of their Request.

58.     The FOIA provides that each agency shall provide for expedited processing of FOIA requests where the requester demonstrates "a compelling need" for the information. 5 U.S.C. § 552(a)(6)(E)(i)(I).

59.     Under the FOIA and Defendants' corresponding regulations, there is a "compelling need" for the information where the records at issue are urgently needed by an organization "primarily engaged in disseminating information" to "inform the public concerning actual or alleged federal government activity." 6 C.F.R.§ 5.5(d)(1)(ii); 28 C.F.R. § 16.5(e)(1)(ii); 32 C.F.R. § 1700.12(c)(2); 34 C.F.R. § 5.21(i)(2)(i)(B); *see also* 22 C.F.R. § 171.12(b)(2)(ii).

60.     The ACLU is primarily engaged in disseminating information to the public within the meaning of the FOIA and the corresponding regulations. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II); 6 C.F.R.§ 5.5(d)(1)(ii); 28 C.F.R. § 16.5(d)(1)(ii); 32 C.F.R. § 1700.12(c)(2); 22 C.F.R. § 171.12(b)(2)(ii); 34 C.F.R. § 5.21(i)(2)(i)(B). Obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of the ACLU's work and are among its primary activities.

61.     Plaintiffs' Request addresses a matter of urgent public concern: namely, the policies, practices, methods, and outcomes associated with Defendants' CVE programs, which

implicate core equality, free speech, and privacy rights concerns, but about which the public knows little. The public lacks even basic information about the programs, including the policies that govern CVE initiatives, which agencies are eligible to receive and award funding under the programs, the specific methods Defendants are to use in implementing the programs, or research or assessments Defendants have used to justify the need for the programs. Such information is of significant and urgent value to the affected communities and the American public. Without disclosure of the records sought, members of the public will not be able to assess for themselves whether the initiatives are necessary, effective, or subject to sufficient limits and privacy and civil liberties safeguards.

## Plaintiffs' Entitlement to a Fee Waiver

62.     The ACLU is entitled to a waiver of document search, review, and duplication fees because disclosure is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the ACLU. *See* 5 U.S.C. § 552(a)(4)(A)(iii); 32 C.F.R. § 1700.6(b)(2); 22 C.F.R. § 171.17(a); 45 C.F.R. § 5.45(a); 34 C.F.R. § 5.33(a).

63.     Numerous news accounts reflect the strong and sustained public interest in the records the ACLU seeks. Given the dearth of information about CVE programs, the strong media and public interest in what little information has been made public, and the fact that allegations of racial and religious profiling and concerns of ineffectiveness have arisen repeatedly in connection with CVE efforts, the records sought in this Request will significantly contribute to public understanding of the government's CVE programs.

64.     Disclosure is not in the ACLU's commercial interest. Any information disclosed by the ACLU as a result of the Request will be available to the public at no cost.

65.     The ACLU is also entitled to a waiver of fees because it qualifies as a representative of the news media and the records are not sought for commercial use. *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II); 6 C.F.R. §5.11(d)(1); 28 C.F.R. § 16.10(d)(1).

66.     The ACLU is a representative of the news media for purposes of the FOIA because it is an entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into distinct work, and distributes that work to an audience.

67.     Plaintiffs do not seek the requested information for commercial reasons. The ACLU summarizes, explains, and disseminates the information it gathers through the FOIA at no cost to the public.

## Causes of Action

68.     Defendants' failure to timely respond to the Request violates the FOIA, 5 U.S.C. § 552(a)(6)(A), and Defendants' corresponding regulations.

69.     Defendants' failure to make a reasonable effort to search for records in electronic form or format responsive to Plaintiffs' Request violates the FOIA, 5 U.S.C. § 552(a)(3)(C), and Defendants' corresponding regulations.

70.     Defendants' failure to make promptly available the records sought by the Request violates the FOIA, 5 U.S.C. § 552(a)(3)(A), and Defendants' corresponding regulations.

71.     Defendant DHS's wrongful withholdings of specific responsive records, or portions thereof, violates the FOIA, 5 U.S.C. §§ 552(a)(3)(A) and (6)(A), and Defendant's corresponding regulations.

72.     The failure of Defendants DHS, DOJ, ODNI, DOS, HHS, and DOE to grant the

ACLU's expedited processing request violates the FOIA, 5 U.S.C. § 552(a)(6)(E), and

Defendants' corresponding regulations.

73.     The failure of the DHS Intelligence and Analysis office, DOJ, FBI, ODNI, and

HHS to grant Plaintiffs' request for a limitation of fees violates the FOIA, 5 U.S.C.

§ 552(a)(4)(A)(iii), and Defendants' corresponding regulations.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Order Defendants to immediately process and release all records responsive to the

Request;

b.  Enjoin Defendants DHS, DOJ, ODNI, and HHS from charging Plaintiffs search, review,

or duplication fees for the processing of the Request;

c.  Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

d.  Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

Hina Shamsi (D.C. Bar No. MI0071)
Hugh Handeyside
Danielle Jefferis
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7321
Fax: (212) 549-2654
hshamsi@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
   of the Nation's Capital
4301 Connecticut Ave., NW, Suite 434

Washington, DC 20008
Phone: (202) 457-0800
Fax: (202) 457-0805
artspitzer@aclu-nca.org

*Counsel for Plaintiffs*

Dated: February 10, 2016